UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| SAFETY NATIONAL CASUALTY CORP., § § § | |
| Plaintiff, § | |
| v. § | CIVIL ACTION NO. H-07-643 |
| § | |
| UNITED STATES DEPARTMENT OF THE TREASURY and COMMISSIONER KENNETH PAPAJ, § § § § | |
| Defendants. § | |

## MEMORANDUM AND ORDER

Before the Court is Defendants' Motion to Dismiss or Transfer. After considering the parties' filings and the applicable law, the Court finds that the motion, Docket No. 18, should be and hereby is **DENIED**.

### I.     BACKGROUND

Plaintiff brings this case under the Administrative Procedures Act to contest an adverse ruling by Defendants, which potentially threatens Plaintiff's ability to do business as a bonding agency with the United States.

Plaintiff Safety National is a Missouri corporation that writes and acts as a surety for immigration bonds. Plaintiff currently holds a certificate of authority to do business with the United States. Defendant Department of the Treasury ("DOT") issues (and can revoke) these certificates, and lists approved sureties in its DOT Circular 570. Defendant Kenneth Papaj is the Commissioner of Financial Management Services, a bureau of DOT. Plaintiff names Defendant Papaj in his official capacity as the government officer who determines whether Plaintiff's certificate should be revoked.

1

In 2005, a dispute arose between Safety National and the Department of Homeland Security ("DHS") regarding 974 bonds that Plaintiff had written. DHS took the position that these bonds had been breached; Plaintiff maintained that it had valid defenses to payment for a substantial number of the bonds. In June 2005, Plaintiff and its co-obligor on the 974 bonds (AAA Bonding Agency, Inc.) initiated suit against DHS in the Southern District of Texas. DHS counterclaimed for a money judgment in the amount allegedly due on the 974 bonds, and other bonds. That case pends before this Court under Civil Action No. 05-cv-2159 (*Safety National Casualty Corp., et al. v. United States Department of Homeland Security, et al.*).

By the time that Safety National and AAA Bonding filed their case, however, DHS had already initiated a complaint against Safety National before DOT. In March 2005, DHS asked DOT to decertify Safety National and remove it from Circular 570. DHS's Complaint stated that "[a]s of this date, Safety National has refused to pay its federal obligations on approximately 974 bonds." The Complaint also identified ten sample bonds from the 974, enclosing detailed information on those bonds. DOT commenced a proceeding, during which it ultimately agreed to examine a total of twenty bonds (the ten submitted by DHS, and ten chosen by Safety National). The parties participated in a DOT hearing on September 19, 2006, in order to take evidence on the sample bonds, and submitted pre- and post-hearing briefing.

Before the DOT, Plaintiff argued that fifteen of the twenty sample bonds had not been breached, and agreed to pay the other five. DHS conceded that no payment was due on seven of the bonds, but contended that the other thirteen were still at issue. On

December 4, 2006, the DOT hearing officer sent a memorandum to Commissioner Papaj, in which he agreed with DHS that thirteen of the sample bonds were due and owing.

On January 23, 2007, Commissioner Papaj issued a ruling in DHS's favor, directing Safety National to pay the full amount currently due on all of the 974 bonds, with interest (for a total of $7,223,382.82). The ruling further stated that Safety National's "failure to comply will result in revocation of your certificate of authority to act as an acceptable surety on behalf of the United States and your removal from Treasury Department Circular 570, without further notice." In support of this ruling, Commissioner Papaj noted only that he adopted the hearing officer's conclusion "that Safety National has exhibited a course and pattern of doing business that is incompatible with a corporation's authority to underwrite insurance on behalf of the United States."[1]

Plaintiff filed the instant suit in February 2007, arguing that the DOT ruling was arbitrary and capricious, an abuse of discretion, and a violation of federal law and Plaintiff's due process rights. The Complaint asks the Court to set aside and vacate the DOT ruling, and seeks injunctive relief preventing Defendants from enforcing the ruling or taking any other action that would impede Plaintiff from doing business with the United States (including removing Plaintiff from Circular 570). Plaintiff also filed a separate motion for a temporary restraining order stopping Defendant DOT from revoking Plaintiff's certificate of authority. Defendants now move to dismiss the case for improper venue or, in the alternative, to transfer the case to the District of Columbia.[2]

---

[1] In a subsequent letter of February 20, 2007, Commissioner Papaj assured Safety National that "[t]he Treasury action is not intended to preclude, or impact, the litigation on the merits or other legal remedies pertaining to the merits of the 974 bonds." The Commissioner also refused to permit Safety National to pay the prescribed cure amount into the registry of the district court.
[2] The parties have agreed to extend Plaintiff's deadline to comply with the DOT ruling at least through the date on which the Court decides the instant motion.

3

## II.     ANALYSIS

### A. Motion to Dismiss

Defendants first move to dismiss the case for improper venue under Federal Rule of Civil Procedure 12(b)(3) and 28 U.S.C. § 1406(a).  Contrary to Defendants' assertion, district courts in this circuit are divided over which party bears the burden of proof with regard to venue after a Rule 12(b)(3) motion has been made.[3]  The issue need not be addressed in this case, however, because it is clear under either analysis that the motion to dismiss should be denied.

Under 28 U.S.C. § 1391(e), a suit "in which a defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States . . . may, except as otherwise provided by law, be brought in any judicial district in which (1) a defendant in the action resides, (2) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated, or (3) the plaintiff resides if no real property is involved in the action."  Plaintiff relies only on subsection (2) to establish venue, arguing that a substantial part of the events giving rise to this suit – namely, the posting of most of the 974 bonds, and the twenty sample bonds examined by DOT – occurred in the Southern District of Texas.  Defendants assert that Plaintiff's claims arise only from the January 2007 ruling and DOT's general authority to issue and revoke Plaintiff's certificate, both of which point to the District of Columbia as

---

[3] *Compare Texas Marine & Brokerage, Inc. v. Euton*, 120 F. Supp. 2d 611 (E.D. Tex. 2000), *Sanders v. Seal Fleet, Inc.*, 998 F. Supp. 729 (E.D. Tex. 1998), and *Bounty-Full Entm't, Inc. v. Forever Blue Entm't Group, Inc.*, 923 F. Supp. 950 (S.D. Tex. 1996) (all holding that a defendant moving to dismiss under Rule 12(b)(3) bears the burden of showing improper venue), *with Norsworthy v. Mystik Transp., Inc.*, 430 F. Supp. 2d 631 (E.D. Tex. 2006), *Langton v. Cbeyond Commc'n, L.L.C.*, 282 F. Supp. 2d 504 (E.D. Tex. 2003) (holding that the plaintiff bears the burden once a motion dismiss for improper venue has been made).

4

the proper venue. Defendants contend that the DOT ruling was based not on the merits of the bonds themselves, but rather on Plaintiff's "pattern and practice" as a bonding agency, and note that Defendants are not parties to the bond contracts between Plaintiff and DHS.

In sum, then, the question before the Court is this: in order to identify where a substantial part of the events giving rise to a claim occurred, how broadly should a Court view the relevant events? The Fifth Circuit has not spoken directly on this issue, but the Court is guided by the First Circuit's opinion in *Uffner v. La Reunion Francaise, S.A.*, 244 F.3d 38 (1st Cir. 2001). *Uffner* involved a diversity action against an insurance company for denial of coverage after the plaintiff's yacht sank in Puerto Rican waters. The *Uffner* Court found that venue in the District of Puerto Rico was proper, because although the claim itself arose directly from the denial of coverage, the underlying yacht accident was nonetheless a substantial part of the events giving rise to the claim. In examining the statutory section governing venue in diversity cases (28 U.S.C. § 1391(a)), the First Circuit opined that to determine where a substantial part of the events giving rise to a claim occurred, "[w]e look, therefore, not to a single 'triggering event' prompting the action, but to the *entire sequence of events underlying the claim*." *Id.* at 42 (emphasis added).

In the instant case, it is true that Plaintiff's claims arise most directly from DOT's adverse ruling. Underlying that ruling, however, were twenty sample (and 974 total) bonds, most of which were posted in the Southern District of Texas.[4] Adopting the

---

[4] Defendants suggest that the DOT ruling focused not on the merits of the bonds themselves, but from Plaintiff's "pattern and course of business that fails to meet the required standards of a surety operating under the auspices of the Treasury." Defs.' Reply 11. Therefore, Defendants reason, venue in this case should not be based on the bonds. The Court recognizes the conceptual distinction between an analysis of

5

*Uffner* principle, then, it is clear that a substantial part of the entire sequence of events giving rise to this case occurred in the Southern District of Texas.

Defendants' efforts to distinguish *Uffner* are unavailing. First, the statutory sections governing venue in diversity cases and cases against the government contain parallel subsections, permitting a party to establish venue in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated." Therefore, *Uffner* is not distinguishable solely because it is a diversity case. The Court does acknowledge certain factual differences between *Uffner* and the present case, most notably that the parties in *Uffner* were mutual parties to a contract, which is not true of the parties in this case. The *Uffner* holding regarding the "entire sequence of events" was couched not in a recitation of the facts of that case, however, but in a discussion of the legislative history and intent behind the venue statute.

For example, the *Uffner* Court wrote that "[p]rior to 1990, § 1391(a) provided venue in 'the judicial district . . . in which the claim arose.' . . . Congress amended the statute to its current form because it found that the old language 'led to wasteful litigation whenever several different forums were involved in the transaction leading up to the dispute.'"[5] *Uffner*, 244 F.3d at 42 (citations omitted). Further, "[t]he pre-amendment

---

the merits of the individual bonds and an examination of Plaintiff's overall business practices, and anticipates that that distinction may be critical in determining the appropriateness of injunctive relief in this case. However, the Court is not persuaded that the conceptual distinction matters in determining venue. The fact remains that the alleged "pattern and practice" of which DOT disapproved arose entirely (or almost entirely) from Plaintiff's business activities *in the Southern District of Texas*. The DOT based its assessment of Plaintiff's business methods on an examination of twenty sample bonds that were posted in the Southern District of Texas.

[5] The 1990 amendments also affected Section 1391(e), substituting the current language referring to any judicial district in which "a substantial part of the events or omissions" arose for the old subsection allowing venue in any district "in which the claim arose." Judicial Improvements Act of 1990, Pub. L. No. 101-650, § 311(3), 104 Stat. 5089, 5114 (1990).

statute also engendered a plethora of tests to determine the single venue in which the claim 'arose.' . . . By contrast, many circuits have interpreted the legislative history of the 1990 amendment as evincing Congress's recognition that when the events underlying a claim have taken place in different places, venue may be proper in any number of districts." *Id.* Finally, although this was not mentioned in *Uffner*, the Supreme Court has opined that Section 1391(e) was enacted to address the problem "that persons in distant parts of the country claiming injury by reason of the acts or omissions of a federal officer or agency were faced with significant expense and inconvenience in bringing suits for enforcement of claimed rights." *Stafford v. Briggs*, 444 U.S. 527, 534 (1980). The Supreme Court cited to a House Committee report stating that "[t]he purpose of this bill is to make it possible to bring actions against Government officials and agencies in U.S. district courts outside the District of Columbia, *which, because of certain existing limitations on jurisdiction and venue, may now be brought only in the U.S. District Court for the District of Columbia.*" *Id.* at 539-40 (citation omitted) (emphasis added in the original). Therefore, "[w]hat emerges is that the bill's author, the Committees, and the Congress intended nothing more than to provide nationwide venue for the convenience of individual plaintiffs in actions which are nominally against an individual officer but are reality against the Government." *Id.* at 542.

Defendants' narrow approach to determining venue in this case would seem to undercut the above rationales behind the enactment and amendment of Section 1391(e). First, examining the "entire sequence of events underlying a claim," as *Uffner* advises, avoids the problem of devising a test to determine the *single* venue in which a claim arose. Second, Defendants' method, if taken to its logical endpoint, suggests that

7

litigation challenging any administrative rulings and actions that occur in the District of Columbia – even those that are based on underlying events in other districts – may be brought only in the District of Columbia.  This result seems clearly to contradict the Congressional intent "to make it possible to bring actions against Government officials and agencies in U.S. district courts outside the District of Columbia."  Finally, the Court has not located any case disapproving of the *Uffner* approach, and the Second and Fourth Circuits have cited *Uffner* approvingly.  *See Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 356-57 (2d Cir. 2005); *Mitrano v. Hawes*, 377 F.3d 402, 405 (4th Cir. 2004).

Defendants point to other authorities on which they argue the Court should rely.  First, Defendants cite a case from this district, in which the Court transferred a lawsuit after determining that there was no basis for venue in the Southern District of Texas.  *Seariver Maritime Fin. Holdings, Inc. v. Peña*, 952 F. Supp. 455 (S.D. Tex. 1996).  In *Seariver*, the owners of a vessel formerly known as the Exxon Valdez sued in the Southern District of Texas for a declaratory judgment that Section 5007 of the Oil Pollution Act of 1990 was unconstitutional.  Section 5007, which was apparently enacted in reaction to the Exxon Valdez spill in the District of Alaska, effectively targeted that vessel alone, prohibiting "tank vessels that have spilled more than 1,000,000 gallons of oil into the marine environment after March 22, 1989 . . . from operating on the navigable waters of Prince William Sound, Alaska."  *Id.* at 457.  The only concrete connection to the Southern District of Texas arose from the fact that the vessel was owned and operated by two Houston-based companies.  Seariver argued, however, that the "effects" of Section 5007 would be felt in the Southern District of Texas.

The district court disagreed with Seariver and ruled that the requirements of Section 1391(e)(2) were not fulfilled, writing that "[e]vents that have only a tangential connection with the dispute at bar are not sufficient to lay venue." *Id.* at 460. Further, the court cited an Eighth Circuit case on which Defendants in the present case also rely, in which the Circuit Court opined that by referring to events or omissions giving rise to a claim, it is likely that "Congress meant to require courts to focus on relevant activities of the defendant, not of the plaintiff." *Id.* (quoting *Woodke v. Dahm*, 70 F.3d 983, 985 (8th Cir. 1995)).

First, the Court is not bound by *Seariver* or *Woodke*, neither of which has been cited, much less approved of, by the Fifth Circuit. Second, the Court observes one important difference between the instant litigation and *Seariver*: in *Seariver*, no *actual underlying event or omission* occurred in the Southern District of Texas. In the present case, the events underlying the DOT proceeding, ruling, and potential administrative action (the posting of the immigration bonds) undisputedly occurred in the Southern District of Texas. The Court would not disagree that, in *Seariver*, the "effects" supposedly felt by the shipowners in Houston were only tangential to the case at bar. The immigration bonds in this case, however, could not credibly be described as tangential to the DOT actions in dispute.

As to *Woodke*, the Court respectfully disagrees with the Eighth Circuit's interpretation of Section 1391. Rather, the Court concurs with the analysis of the Southern District of Texas Bankruptcy Court, which wrote the following: "The venue statute states that an action may be filed in 'a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred . . .', 28 U.S.C. §§ 1391(a)

9

and (b), and does not specify that a court must look only to the defendant's activities, as the *Woodke* court holds. *Woodke* inserts language in § 1391 that alters the statute's meaning. The court declines to follow *Woodke*'s reading of § 1391(b) to the extent it focuses on defendant's activities only." *In re Enron Corp.*, 317 B.R. 701, 708 (Bankr. S.D. Tex. 2004).

The *Woodke* Court expressed concern that the venue statute not be construed so as to "abandon altogether the protection of defendants as a relevant consideration in venue matters." *Woodke*, 70 F.3d at 985. Defendants also cite a Supreme Court case stating that "[i]n most instances, the purpose of statutorily specified venue is to protect the *defendant* against the risk that a plaintiff will select an unfair or inconvenient place of trial." *Leroy v. Great W. United Corp.*, 443 U.S. 173, 183-84 (1979). In the Court's view, however, the plain language of Section 1391(e)(2), requiring a *substantial part* of the events or omissions giving rise to a claim in order to establish venue in a particular district, do afford sufficient protection to defendants, without reading in additional restrictions. In the present case, there appears to be more than one district in which Plaintiff could have sued, including at least the Southern District of Texas and the District of Columbia. Plaintiff has not haled Defendants into court in a remote district completely unconnected (or only tangentially connected) to the events underlying this litigation. Further, the Court is not obligated to determine the "best" venue, but only whether or not its venue is proper. *Seariver*, 952 F. Supp. at 459 (citing *Setco Enters. Corp. v. Robbins*, 19 F.3d 1278, 1281 (8th Cir. 1994), and *Cottman Transmission Sys. v. Martino*, 36 F.3d 291, 294 (3d Cir. 1994)). For the above reasons, the Court finds that a substantial part of the events underlying Plaintiff's cause of action occurred in the

Southern District of Texas, and that Plaintiff's choice of venue is proper. Defendants' Motion to Dismiss must therefore be denied.

### B. Motion to Transfer

In the alternative, Defendants ask the Court to transfer the case to the District of Columbia. Under 28 U.S.C. § 1404(a), a correctly filed case may nevertheless be transferred to another district "[f]or the convenience of parties and witnesses, in the interest of justice." For the below reasons, the Court finds that transfer is not warranted.

The parties agree that Defendants, as the movants under Section 1404(a), bear the burden of establishing the propriety of the transfer and the superiority of the transferee district. *E.g.*, *Zamora-Garcia v. Moore*, No. M-05-331, 2006 WL 331034, at *3 (S.D. Tex. Nov. 16, 2006) (citing cases). Further, in weighing alternate venues, the plaintiff's choice of venue normally should not be disturbed, unless clearly outweighed by other factors. *E.g.*, *Vasquez v. Bridgestone/Firestone, Inc.*, 325 F.3d 665, 672 (5th Cir. 2003); *Peteet v. Dow Chem. Co.*, 868 F.2d 1428, 1436 (5th Cir. 1989); *Howell v. Tanner*, 650 F.2d 610, 616 (5th Cir. Unit B July 1981). The Supreme Court set forth private and public factors to be weighed in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947), and reaffirmed them in *Piper Aircraft Co. v. Reyno*, 454 U.S. 235 (1981).[6] The private concerns include 1) the relative ease of access to sources of proof; 2) the availability of compulsory process to secure the attendance of witnesses; 3) the cost of attendance for willing witnesses; and 4) all other practical problems that make trial of a case easy, expeditious and inexpensive. The public concerns include: 1) the administrative difficulties flowing from court congestion; 2) the local interest in having localized interests decided at home; 3) the familiarity of the forum with the law that will govern the

---

[6] Defendants do not address the *Gulf Oil* factors in their motion to transfer.

11

case; and 4) the avoidance of unnecessary problems of conflict of laws of the application of foreign law.  *Id.* at 241 n.6.

### 1. Private factors

The private *Gulf Oil* factors relate generally to the practical aspects of litigation – cost, location of evidence and witnesses, etc.  Defendants point to the fact that the potential primary witnesses involved in the DOT proceeding (*e.g.*, the DOT hearing officer and Commissioner Papaj) are located in the District of Columbia, along with the relevant documents and counsel for both Plaintiff and Defendants.  In the Court's view, however, these factors do not weigh heavily in favor of transfer.  With regard to witnesses, Plaintiff has acknowledged that it will seek to call the hearing officer and Commissioner Papaj in proceedings associated with this case.  In that respect, the private factors tilt towards transfer.  However, given that Plaintiff resides in Missouri and that the disputed bonds were posted in the Southern District of Texas, the Court is not persuaded that *all* relevant witnesses reside in the District of Columbia.

As to the issue of documents, it appears to the Court that the case will involve a largely closed, relatively limited administrative record, a significant portion of which seems already to have been attached to pleadings; therefore, any additional burden of producing and transporting documents would likely not be unduly burdensome.  Indeed, Defendants themselves characterize the case as a "largely legal dispute," buttressing the Court's impression that access to sources of proof will not be overly complicated.  The Court further agrees with Plaintiff that "the convenience of counsel is not a factor to be assessed in determining whether to transfer a case under § 1404(a)," *In re Volkswagen AG*, 371 F.3d 201, 206 (5th Cir. 2004), and in any case, Defendants are presently

represented by counsel from the United States Attorney's Office for the Southern District of Texas. Finally, transfer to the District of Columbia would undoubtedly undermine the object of making "trial of a case easy, expeditious and inexpensive." As Plaintiff points out, the present case is related closely to the litigation between Plaintiff and DHS that pends in this district, and this Court is already familiar with many of the complex factual and legal issues that are likely to arise. Transfer would unnecessarily force another district court to take up these issues; would impede communication regarding the relationship between the two cases; and would undoubtedly delay a resolution to the dispute between the parties. In light of the above considerations, the Court finds that the private *Gulf Oil* factors weigh evenly between the parties.

### 2. Public factors

The public factors set forth in *Gulf Oil* and *Piper* are, again: 1) the administrative difficulties flowing from court congestion; 2) the local interest in having localized interests decided at home; 3) the familiarity of the forum with the law that will govern the case; and 4) the avoidance of unnecessary problems of conflict of laws of the application of foreign law. *Piper*, 454 U.S. at 241 n.6. With regard to these factors, Defendants argue only that "transfer to the District of Columbia will conserve resources of the federal government, which serves the public interest," referring to the expense of transporting witnesses from the District of Columbia to the Southern District of Texas. However, the ease of access to witnesses is more properly characterized as a private factor than a public one, even when the witnesses are federal employees, and has already been discussed above. Further, the conservation of the government's resources is *not* equivalent to "[t]he conservation of scarce judicial resources," as Defendants' motion to transfer appears to

13

suggest; the Court has already opined that transfer to another district court will waste, rather than conserve, judicial resources.

Plaintiff argues that the Southern District of Texas "has a significant interest in the manner in which immigration bonds are issued and administered." The Court concurs in this assessment, and perceives no special localized interest in litigating the case in the District of Columbia. As to the other public factors, there is, as yet, no apparent issue regarding conflict of laws; nothing suggests that this Court would be disadvantaged in its familiarity with the relevant law; and there is no evidence that the Southern District of Texas is more congested than the District of Columbia.[7] The Court finds that the public factors weigh in favor of Plaintiff. Therefore, the Court must respect Plaintiff's choice of venue, and deny discretionary transfer to the District of Columbia.

## III.   CONCLUSION

Defendants' Motion to Dismiss or Transfer is **DENIED.**

**IT IS SO ORDERED**.

**SIGNED** at Houston, Texas, on this the 20th day of August, 2007.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

**TO INSURE PROPER NOTICE, EACH PARTY WHO RECEIVES
THIS ORDER SHALL FORWARD A COPY OF IT TO EVERY
OTHER PARTY AND AFFECTED NON-PARTY EVEN THOUGH
THEY MAY HAVE BEEN SENT ONE BY THE COURT.**

---

[7] Plaintiff submits statistics, in fact, suggesting that the District of Columbia is more congested than the Southern District of Texas. Pl.'s Resp. 12.